No. 2013-1349

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

MONSANTO COMPANY AND
MONSANTO TECHNOLOGY LLC, *Plaintiffs-Appellees*,

*v.*

E.I. DU PONT DE NEMOURS AND COMPANY AND
PIONEER HI-BRED INTERNATIONAL, INC., *Defendants-Appellants.*

Appeal from the United States District Court for the Eastern District of Missouri in
Case No. 09-CV-0686, Judge E. Richard Webber

## NON-CONFIDENTIAL BRIEF FOR APPELLEES MONSANTO COMPANY AND MONSANTO TECHNOLOGY LLC

GEORGE C. LOMBARDI
JAMES MATTHEW HILMERT
ERIC J. MERSMANN
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601

JOHN JUSTIN ROSENTHAL
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006

JOSEPH P. CONRAN
HUSCH BLACKWELL, LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105

SETH P. WAXMAN
PAUL R.Q. WOLFSON
THOMAS G. SAUNDERS
CAROLYN JACOBS CHACHKIN
DANIEL AGUILAR
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000

September 23, 2013

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellees Monsanto Company and Monsanto Technology LLC certifies the following:

1.    The full name of every party or amicus represented by me is:

        Monsanto Company
        Monsanto Technology LLC

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

        None

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

        None

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

WILMER CUTLER PICKERING HALE AND DORR LLP:  Daniel Aguilar, Kerry Begley, Carolyn Jacobs Chachkin, Thomas G. Saunders, Seth P. Waxman, Paul R.Q. Wolfson

WINSTON & STRAWN LLP:  Matthew A. Campbell, Todd J. Ehlman, James M. Hilmert, George C. Lombardi, Kurt A. Mathas, Eric J. Mersmann, Adam S. Nadelhaft, Ian J. Nomura, Peter E. Perkowski, John J. Rosenthal, Rebecca M. Ross, Stephen R. Smerek, Andrew E. Smith, Mark A. Smith, Zachary L. Spencer, Gail J. Standish, Erica E. Stauffer, Dan K. Webb, Jovial Wong

ARNOLD & PORTER LLP:  Anthony J. Franze, Robert N. Weiner

COVINGTON & BURLING LLP:  Kurt G. Calia

HUSCH BLACKWELL LLP:  Mark G. Arnold, Steven M. Berezney, Dutro E. Campbell II, Joseph P. Conran, Greg G. Gutzler, Erik L. Hansell, Omri E. Praiss, Tamara M. Spicer

MCDERMOTT WILL & EMERY LLP:  Scott W. Clark, Susan K. Knoll, Steven G. Spears

Dated:    September 23, 2013              /s/ Seth P. Waxman
                                                              Seth P. Waxman

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF AUTHORITIES ................................................................ vi

STATEMENT OF RELATED CASES ................................................... 1

INTRODUCTION ................................................................................ 1

STATEMENT OF ISSUES .................................................................... 3

STATEMENT OF THE CASE ............................................................... 4

STATEMENT OF FACTS ..................................................................... 4

I.   THE PARTIES AND THE 2002 LICENSE AGREEMENT ........................ 4

    A.   Monsanto And Its Relationship With DuPont ..................... 4

    B.   DuPont's Failed Attempts To Develop Its Own Glyphosate-Tolerance Trait ................................................................ 8

II.  THIS LITIGATION ......................................................................... 10

    A.   DuPont Raises Its Reformation Claim ................................ 10

    B.   DuPont Reasserts And Expands Its Reformation Claim .................... 12

    C.   DuPont Continues To Assert Reformation While Impeding Discovery Regarding Its Subjective Beliefs ...................... 14

III. DUPONT'S INTERNAL DOCUMENTS ............................................. 16

    A.   2002 Documents ................................................................ 17

    B.   2007-2008 Documents ...................................................... 20

IV.  DISTRICT COURT PROCEEDINGS ON MONSANTO'S MOTION FOR SANCTIONS ................................................................................. 24

    A.   Monsanto's Motion For Sanctions And DuPont's Response ........... 24

iii

B.     The District Court's Order .......................................................... 25

       1.    Factual Findings ................................................................ 25

       2.    Remedy .............................................................................. 28

V.    REMAINING DISTRICT COURT PROCEEDINGS ................................. 29

SUMMARY OF ARGUMENT ................................................ 30

STANDARD OF REVIEW.................................................... 33

ARGUMENT .................................................................. 34

I.    THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION BY IMPOSING SANCTIONS BASED ON DUPONT'S FALSE REPRESENTATIONS CONCERNING ITS SUBJECTIVE BELIEFS ABOUT THE 2002 AGREEMENT ........ 35

    A.     The District Court Had Inherent Power To Award Attorney's Fees Based On DuPont's Bad-Faith Abuse Of The Judicial Process ......................................................................... 35

    B.     The District Court Properly Found, Based On DuPont's Internal Documents, That DuPont Had Misrepresented Its Subjective Beliefs About The 2002 Agreement ................................. 36

       1.    DuPont placed its subjective beliefs at issue by pressing its reformation claim ................................................ 36

       2.    DuPont misrepresented its subjective beliefs about the 2002 Agreement ....................................................... 38

    C.     The District Court Properly Found That DuPont Acted In Bad Faith ............................................................................. 44

    D.     The District Court Imposed A Narrowly Tailored Sanction.............. 45

II.    DUPONT'S OBJECTIONS TO THE SANCTIONS ORDER LACK MERIT................ 46

    A.     The Court Sanctioned DuPont For Repeated Misrepresentations, Not Objective Advocacy .................................................. 46

    B.     DuPont's Ability To Use Selectable Markers Is Not At Issue........... 50

C. The Statements Of DuPont's High-Level Employees Are Appropriately Attributable To DuPont .............................................. 54

D. The Court Properly Relied Upon DuPont's 2007-2008 Statements ......................................................................................... 56

E. The Court's Dismissal Of The Reformation Claim Was Proper ....... 59

F. The More Stringent Standard For "Fraud On The Court" That DuPont Urges Governs Only Extremely Severe Sanctions Not At Issue Here ......................................................................................... 60

CONCLUSION ................................................................................................. 64

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## CONFIDENTIAL MATERIAL OMITTED

The material omitted at pages 17-23, 26, 39-42, 52, 55-56, and 58 are the names of individual DuPont and Pioneer employees and other information that would allow certain individual DuPont and Pioneer employees to be identified. The material omitted at pages 11-12, 14, 34, 38, and 55 was filed under seal by DuPont or contains information that was designated confidential by DuPont. The material omitted at pages 15 and 29 is contained in orders or transcripts sealed by the district court.

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Amsted Industries Inc. v. Buckeye Steel Castings Co.*,
  23 F.3d 374 (Fed. Cir. 1994) .......................................................34

*Boogaerts v. Bank of Bradley*,
  961 F.2d 765 (8th Cir. 1992) .......................................................50

*Bowman v. Monsanto Co.*,
  133 S. Ct. 1761 (2013).............................................................4, 5

*Broyhill Furniture Industries, Inc. v. Craftmaster Furniture Corp.*,
  12 F.3d 1080 (Fed. Cir. 1993) ................................................61, 62

*Cerberus International Ltd. v. Apollo Management, L.P.*,
  794 A.2d 1141 (Del. 2002).....................................................*passim*

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991)............................................34, 35, 45, 50, 62

*Clariant Corp. v. Harford Mutual Insurance Co.*,
  11 A.3d 220 (Del. 2011)...............................................................57

*Coleman v. Commissioner*,
  791 F.2d 68 (7th Cir. 1986) .........................................................43

*Collins v. Burke*,
  418 A.2d 999 (Del. 1980)..............................................................58

*Croxton v. Chen*,
  No. 147, 1998, 1998 WL 515346 (Del. June 26, 1998) ................57

*Easley v. Cromartie*,
  532 U.S. 234 (2001).....................................................................36

*Finnigan Corp. v. ITC*,
  180 F.3d 1354 (Fed. Cir. 1999) ....................................................51

*First Bank of Marietta v. Hartford Underwriters Insurance Co.*
  307 F.3d 501 (6th Cir. 2002) .......................................................43

*Fitzgerald v. Cantor*,
No. 16297-NC, 1999 WL 64480 (Del. Ch. Jan. 28, 1999)...........................57

*Gas Aggregation Services v. Howard Avista Energy, LLC*,
458 F.3d 733 (8th Cir. 2006) ........................................................35

*Great Coastal Express, Inc. v. International Brotherhood of Teamsters,
Chauffeurs, Warehousemen & Helpers of America*, 675 F.2d 1349
(4th Cir. 1982) ...............................................................61, 62

*Greiner v. City of Champlin*,
152 F.3d 787 (8th Cir. 1998) .....................................................50, 62

*Harlan v. Lewis*,
982 F.2d 1255 (8th Cir.) .........................................................33, 35

*Hob Tea Room, Inc. v. Miller*,
89 A.2d 851 (Del. 1952) ..............................................................37

*Kupferman v. Consolidated Research & Manufacturing Corp.*,
459 F.2d 1072 (2d Cir. 1972) ........................................................62

*Lee v. L.B. Sales, Inc.*,
177 F.3d 714 (8th Cir. 1999) ........................................................36

*Monsanto Co. v. David*,
516 F.3d 1009 (Fed. Cir. 2008) .......................................................5

*Nationwide Mutual Insurance Co. v. Starr*,
575 A.2d 1083 (Del. 1990)...........................................................58

*Nichols v. Klein Tools, Inc.*,
949 F.2d 1047 (8th Cir. 1991) .......................................................62

*Pfizer, Inc. v. International Rectifier Corp.*,
538 F.2d 180 (8th Cir. 1976) ........................................................62

*Roadway Express, Inc. v. Piper*,
447 U.S. 752 (1980)..................................................................35

*Rowland v. California Men's Colony*,
506 U.S. 194 (1993)..................................................................54

*Rozier v. Ford Motor Co.*,
  573 F.2d 1332 (5th Cir. 1978) ...................................................62

*Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real
  Estate Fund*, 68 A.3d 665 (Del. 2013) ......................................36

*Southland Security Corp. v. INSpire Insurance Solutions, Inc.*,
  365 F.3d 353 (5th Cir. 2004) ....................................................55

*United States v. Buck*,
  281 F.3d 1336 (10th Cir. 2002) ................................................62

*United States v. Shaffer Equipment Co.*,
  11 F.3d 450 (4th Cir. 1993) ......................................................59

*United States v. Smiley*,
  553 F.3d 1137 (8th Cir. 2009) ..................................................62

*Willhite v. Collins*,
  459 F.3d 866 (8th Cir. 2006) ........................................34, 35, 36

## RULES

Fed. R. Civ. P.
  R. 11.......................................................................................50
  R. 60...............................................................................61, 62

## ADMINISTRATIVE AGENCY MATERIALS

EPA, *Plant-Pesticides Subject to the Federal Insecticide, Fungicide, and
  Rodenticide Act and the Federal Food, Drug, and Cosmetic Act*,
  61 Fed. Reg. 37,891 (July 22, 1996) .........................................52

FDA, *Biotechnology Consultation Note to the File BNF No. 000034*
  (Sept. 18, 1996), *available at* http://www.fda.gov/ForConsumers/
  ConsumerUpdates/ucm161154.htm ............................................52

USDA, *Plant Pest Risk Assessment for Monsanto MON 87701 Soybeans*
  (June 28, 2011), *available at* http://www.aphis.usda.gov/brs/
  aphisdocs/09_08201p_dpra.pdf...................................................52

USDA, *Availability of Environmental Assessment for Field Test of Genetically Engineered Rice Expressing Lysozyme*, 70 Fed. Reg. 8762 (Feb. 23, 2005)......................................................................52

USDA, *Petition for the Determination of Nonregulated Status for Herbicide Tolerant 356043 Soybean*, *available at* http://www. aphis.usda. gov/brs/aphisdocs/06_27101p.pdf............................................53

## OTHER AUTHORITIES

Lambert, Jolanda M., et al., *Cre*-lox-*Based System for Multiple Gene Deletions and Selectable-Marker Removal in* Lactobacillus plantarum, 73 Applied & Envtl. Microbiology 1126 (2007), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC 1828656/pdf/1473-06.pdf ...........................................................................52

Padgette, S.R., et al., *Development, Identification, and Characterization of a Glyphosate-Tolerant Soybean Line*, 35 Crop Sci. 1451 (1995).......10, 52

11 Wright, Charles A., et al., *Federal Practice and Procedure* (3d ed. 2012) ....................................................................................................61, 62

## STATEMENT OF RELATED CASES

DuPont and certain current and former directors and officers are defendants in a shareholder derivative suit based in part on the misrepresentations revealed by the sanctions order in this case. *See Zomolsky v. Kullman*, No. 1:13-cv-00094 (D. Del.). Monsanto is not aware of any other related cases.

## INTRODUCTION

The district court did not sanction DuPont for zealous advocacy or making erroneous legal arguments. The court sanctioned DuPont for "repeatedly and systematically" making "false representations to the Court about [its] subjective beliefs regarding stacking rights and restrictions" in its license agreement with Monsanto. J.A.76. Those representations—which "provide[d] the basis for many of [DuPont's] breach of contract defenses and reformation counterclaims" (J.A.46)—were directly contradicted by internal documents DuPont was forced to produce after dragging Monsanto through more than a year of litigation. Because DuPont's "misrepresentations" had "prolonged the[] already-protracted proceedings and caused unnecessary expense" (J.A.52), the court imposed targeted sanctions to compensate Monsanto and deter future misconduct. Those sanctions were well within the court's discretion.

Monsanto's patented Roundup Ready® traits allow soybean and corn plants to tolerate exposure to the herbicide glyphosate. In 2006, DuPont announced that

1

it had created its own glyphosate-tolerance trait ("OGAT") for which it would not have to pay royalties under its limited Roundup Ready® license. OGAT proved to be a failure. But rather than admit as much to its customers and investors, DuPont secretly combined, or "stacked," Monsanto's Roundup Ready® trait on top of its own, in violation of the license provision limiting DuPont to the production of licensed commercial seed exhibiting "genetically-engineered protection against Glyphosate herbicide *solely due to* the presence of" Monsanto's trait. J.A.658.[1]

DuPont was eventually exposed, Monsanto sued, and the district court rejected DuPont's litigation-driven interpretation of the license. Desperate to commercialize the product it had trumpeted and to defend against Monsanto's infringement claims, DuPont pressed for "reformation" of the contract, arguing that the agreement's plain language did not accurately reflect the intent of the sophisticated companies that had executed it. To support this extraordinary claim, DuPont asserted numerous times that it had *always* believed that the license allowed it to produce a commercial soybean product expressing glyphosate-tolerance through traits in addition to Roundup Ready®. These misrepresentations forced Monsanto to litigate DuPont's reformation claim for more than a year.

DuPont's attempt to rewrite the license by falsely representing its subjective beliefs collapsed, however, when it was compelled to produce previously

---

[1]    All emphasis in quoted passages has been added, unless otherwise specified.

undisclosed internal documents.  Those documents confirmed that DuPont had

known all along that the license would present serious obstacles to its production

and commercialization of seed with more than one glyphosate-tolerance trait.

Correctly concluding that DuPont had abused the judicial process and improperly

forced Monsanto and the court to expend substantial effort responding to baseless

reformation claims, the district court sanctioned DuPont by dismissing those

claims and requiring it to pay the attorney's fees Monsanto incurred defending

against them.

Judge Webber, who oversaw this complex dispute and saw first-hand how

DuPont's litigation conduct adversely affected the progress of this case, did not

arrive at his decision lightly.  He undertook a thorough and careful review of the

documents and extended briefing, held a lengthy hearing at which DuPont declined

to present testimony, and ultimately elected to impose a sanction narrowly tailored

to DuPont's specific bad-faith conduct.  His findings and conclusions warrant great

deference and should not be disturbed on appeal.

## STATEMENT OF ISSUES

Whether the district court permissibly exercised its discretion in ordering

DuPont to pay attorney's fees as a sanction for the false representations of fact

DuPont made to support its reformation claims.

## STATEMENT OF THE CASE

DuPont's statement of the case is inaccurate in two principal respects:

First, the district court did not sanction DuPont for "even arguing that it did not breach the agreement and … raising reformation defenses and counterclaims." Br. 4. Rather, the court sanctioned DuPont for making factual misrepresentations regarding the basis for its reformation claims—centrally, that DuPont always believed it was authorized to stack another glyphosate-tolerance trait with Roundup Ready® in commercial seed, and never understood the license's "solely" language to be a stacking restriction.

Second, the only issue on appeal is whether the court abused its discretion in awarding attorney's fees. The court's other sanction—striking DuPont's reformation counterclaims and defense—is not at issue because the parties settled the underlying dispute and agreed to the dismissal of all claims, defenses, and counterclaims. *See* J.A.33976-33984.

## STATEMENT OF FACTS

### I. THE PARTIES AND THE 2002 LICENSE AGREEMENT

### A. Monsanto And Its Relationship With DuPont

Monsanto "invented a genetic modification that enables soybean plants" to tolerate "exposure to glyphosate, the active ingredient in many herbicides." *Bowman v. Monsanto Co.*, 133 S. Ct. 1761, 1764 (2013); *see* J.A.470; J.A.2232. Monsanto markets soybean seed containing this genetic material as Roundup

Ready® seed. Farmers planting Roundup Ready® seed can use a glyphosate-based herbicide to kill weeds without damaging their crops. *See Bowman*, 133 S. Ct. at 1764; *Monsanto Co. v. David*, 516 F.3d 1009, 1011 (Fed. Cir. 2008); J.A.3771-3772.

Monsanto has obtained several patents claiming the Roundup Ready® technology, including the one at issue in this litigation, U.S. Patent No. RE39,247E. *See* J.A.470-471; J.A.497; J.A.2232-2233. Monsanto has shared its invention broadly, licensing the technology to both small seed companies and its large competitors, including Pioneer, which is now a subsidiary of DuPont. J.A.470-471; J.A.3736-3737.

In 1992, Monsanto granted Pioneer a limited license to make and sell seed containing Monsanto's Roundup Ready® soybean trait ("1992 License"). *See* J.A.656; J.A.14826-14827; J.A.14833-14834; J.A.26567-26568. That license terminated when Pioneer was acquired by DuPont. Order at 4, Dkt. No 168, *Monsanto v. Pioneer Hi-Bred Int'l, Inc.*, No. 99-1917 (E.D. Mo. Mar. 20, 2001). In 2002, Monsanto granted Pioneer new limited licenses to Monsanto's Roundup Ready® soybean trait (known as "Soybean Event: 40-3-2"), and Roundup Ready®

corn trait (known as "Corn Event: NK603"). *See* J.A.656; J.A.658; J.A.660; J.A.2232-2233.[2]

The 2002 Soybean License Agreement ("the Agreement") permitted DuPont to produce, under specific conditions, Roundup Ready® soybeans expressing other beneficial traits, including tolerance to herbicides *other than* glyphosate. *See, e.g.*, J.A.660-661 (§§ 3.01(e) & 3.01(i)); *see also* J.A.14419; J.A.14421. The Agreement did not, however, give DuPont authority to produce or sell seeds expressing more than one *glyphosate*-tolerance trait. Rather, several provisions explicitly limited DuPont to making and selling seeds that exhibit glyphosate tolerance *solely* due to Monsanto's Roundup Ready® trait.

First, the license grant in Section 3.01(a) of the Agreement was limited to a particular "Licensed Field":

> Monsanto hereby grants to Licensee, and Licensee, hereby accepts, a non-exclusive license *within the Licensed Field* … to develop, use, produce, have produced, offer to sell, sell and import Licensed Commercial Seed ...."

J.A.660.

Second, the Agreement prohibited use of Monsanto's biological materials outside the Licensed Field. Section 3.01(g) provided that Pioneer "shall not be

---

[2]    The sanctions order refers to both agreements, but Monsanto later dismissed all of its claims regarding the Roundup Ready® corn trait. *See* J.A.26567. Given the similarity of the two licenses, this brief cites the 2002 soybean license for simplicity.

entitled to … (iv) use Biological Materials *outside of the Licensed Field*."[3]

J.A.661.

Finally, Section 2.09 of the Agreement defined the term "Licensed Field" to mean:

> Licensed Commercial Seed which exhibit genetically-engineered protection against Glyphosate herbicide *solely due to* the presence of the Glyphosate-Tolerant Soybean Event: 40-3-2.

J.A.658. Thus, to the extent DuPont wanted to produce and market seed exhibiting tolerance to glyphosate, it was limited to doing so where the glyphosate tolerance resulted *solely* from Monsanto's patented trait. *See* J.A.2254; J.A.3720; *see also* J.A.26574-26575; J.A.26582. This restriction helped ensure that DuPont would not shift the goodwill associated with Monsanto's Roundup Ready® trait to a glyphosate-tolerance trait that DuPont might develop, as DuPont later attempted when it stacked traits without disclosing the presence of Monsanto's Roundup Ready® trait. The restriction also avoided problems such as gene silencing that can occur with stacked traits and helped maintain clear lines of responsibility for the glyphosate tolerance of seed sold under the license.

---

[3]    "Biological Materials" are defined as "the biological material previously supplied by Monsanto to Licensee for the purpose of developing Licensed Commercial Seed from" the 40-3-2 event. *See* J.A.657.

## B.     DuPont's Failed Attempts To Develop Its Own Glyphosate-Tolerance Trait

In the mid-2000s, DuPont sought to develop its own competing platform for glyphosate tolerance.  DuPont began working on a trait called Optimum® GAT®, or "OGAT," that would allow a plant to express tolerance to a variety of herbicides, including glyphosate-based herbicides and acetolactate synthase ("ALS") inhibitors.  *See* J.A.33991; J.A.30202(5:3-8); J.A.31460; *see also* J.A.3739.  In March 2006, DuPont publicly revealed its new trait.  Touting the "unsurpassed glyphosate tolerance" provided by OGAT, DuPont predicted that the new trait would receive full U.S. regulatory approval "for use in soybeans and corn as early as 2009."  J.A.33991-33992; J.A.30202(5:3-8).

Despite repeated public statements to the contrary, DuPont's extensive internal testing during 2007 and 2008 revealed that OGAT failed to provide reliable herbicide tolerance and could never be sold as a stand-alone trait.  *See* J.A.34000; J.A.34004; J.A.34017-34020 (discussing recommendation to "Discontinue further Optimum® GAT® only crosses"); J.A.31463; *see also* J.A.14281 ("Gat … is not going well in soy as a source of gly[phosate-tolerance]").  But DuPont did not publicly admit this failure until February 2009. *See* J.A.28616-28620(55:20-59:20) (OGAT by itself posed an "unacceptable risk" to farmers).

Instead, DuPont leadership decided in January 2008 to abandon OGAT as a stand-alone trait and to secretly cross-breed plants expressing both OGAT and Roundup Ready® traits ("OGAT/RR stack"). *See* J.A.31463-31464; J.A.33994-33995; J.A.33998. DuPont's internal documents recognized that it needed to "[n]egotiate access to an alternate glyphosate tolerance source for stacking" such as a "license to commercialize" a stack with "RR1." J.A.34019; J.A.34021. Monsanto and DuPont attempted to negotiate an amendment to the 2002 Agreement that would have allowed DuPont to commercialize an OGAT/RR stack, but the negotiations failed because DuPont was unwilling to pay the large lump-sum value that Monsanto placed on those stacking rights. *See* J.A.28614-28615(53:24-54:20). DuPont nonetheless pressed forward with its plans to commercialize the stack under the same name it had used to market the stand-alone product. J.A.33994-33997; J.A.31906-31913(17:24-24:8); J.A.31464; J.A.31470.

At no point in this development process did DuPont use OGAT as a "selectable marker." A selectable marker is a gene inserted into a plant cell along with gene of interest in certain genetic-engineering techniques to help indicate whether the transformation has been successful. J.A.591-592(44:37-45:46); J.A.22292(5:41-53); J.A.27308. For example, if a researcher wants to insert a trait for insect resistance, the researcher might simultaneously attempt to insert a selectable marker gene that confers resistance to a herbicide. The researcher can

9

then expose the target cells to the herbicide in the laboratory to determine whether

they have been transformed, *i.e.*, carry the insect-resistance gene as well. This

does not necessarily mean that the "marker" gene will provide enough tolerance to

protect the plant from the herbicide under commercial conditions or that the

selectable marker will remain in the seed line after further breeding. Padgette et

al., *Development, Identification, and Characterization of a Glyphosate-Tolerant*

*Soybean Line*, 35 Crop Sci. 1451, 1457 (1995) ("scoreable marker" gene, which

functions like a selectable marker but produces a directly observable effect, was

"lost through normal genetic segregation"). Rather, a selectable marker is a

research tool.

For DuPont, OGAT and Roundup Ready[®] were not proxies for other traits

but were themselves the traits that DuPont wanted to combine. Nor would OGAT

have worked as a selectable marker in cells that were already resistant to

glyphosate due to the Roundup Ready[®] trait. DuPont thus relied on traditional

cross-breeding techniques to create its OGAT/RR product.

## II.    THIS LITIGATION

### A.    DuPont Raises Its Reformation Claim

After it became clear that DuPont intended to market seed expressing both

the Roundup Ready[®] and OGAT traits, Monsanto filed suit, alleging patent

infringement and breach of contract. J.A.481-489. In its Answer and

**CONFIDENTIAL MATERIAL OMITTED FROM THIS PAGE**

Counterclaim to Monsanto's Complaint, DuPont belatedly acknowledged that it had created a "stacked … OGAT/RR product" that it "intend[ed] to commercialize" (J.A.847; J.A.881; *see also* J.A.853), but asserted that the Agreement authorized these activities (*see* J.A.908 (Count 12)).  DuPont further asserted that, if the Agreement was interpreted to prohibit "*any conduct* by [DuPont] with regard to ▮▮▮▮▮▮▮▮▮▮▮ it should be "reform[ed] … to allow such activity," based on the parties' alleged intent.  J.A.909; *see also* J.A.844; J.A.1090-1091; J.A.1026; J.A.1219.

In January 2010, the district court granted Monsanto partial judgment on the pleadings.  *See* J.A.2254-2255.  The court ruled that the "license agreements do not grant Pioneer the right to stack its OGAT glyphosate-tolerance trait technology with the licensed Roundup Ready® soybean and corn traits, as the agreements are unambiguous in restricting Pioneer's right to manufacture and commercialize seed products to those products that exhibit glyphosate tolerance solely due to 40-3-2 and NK603."  J.A.2254.

DuPont moved for reconsideration.  *See* J.A.2333; J.A.2348.  In July 2010, the court ruled that it would not reconsider "its ruling that the license agreements did not grant [DuPont] a right to create OGAT/RR stacked seed products." J.A.3720.  At DuPont's urging, however, the court restored DuPont's reformation counterclaim.  *Id.*; *see also* J.A.3733.

**CONFIDENTIAL MATERIAL OMITTED FROM THIS PAGE**

## B. DuPont Reasserts And Expands Its Reformation Claim

While DuPont's reconsideration motion was pending, DuPont sought leave to file a Second Amended Answer and Counterclaims ("SAAC") to add three counterclaims for contract reformation, as well as roughly 80 paragraphs of additional allegations to support those claims.  *See* J.A.3724; J.A.3750; J.A.3901-3906.  DuPont asserted that its new allegations ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ J.A.2750.  DuPont also stressed that its new claims were the product of ███████████████████ involving "additional investigations" into the factual basis for their allegations.  J.A.2745; J.A.2754-2755.

DuPont's SAAC again acknowledged DuPont's creation of, and intent to sell, an "OGAT/RR product."  *See* J.A.3754; J.A.3761; J.A.3764-3765; J.A.3778; J.A.3842.  It also reasserted that DuPont had subjectively understood the Agreement to allow it to prepare a commercial stack combining any trait conferring glyphosate tolerance with Monsanto's Roundup Ready® trait:

- "317.  Any conclusion by the Court that the Soybean and Corn License Agreements prohibit Pioneer from stacking OGAT in Licensed Commercial Seed, or Licensed Corn Product, constitutes a material deviation from *the parties' specific understanding* that these agreements would not prohibit Pioneer in this manner."  J.A.3844.

- "335. … *Pioneer and DuPont understood* that the Agreements expressly *authorized Pioneer to introduce any gene and/or trait into Licensed Commercial Seed* and Licensed Corn Products …." J.A.3850.

- "574. Should the Court determine that any term of the Soybean and Corn License Agreements legally operate to prohibit Pioneer from stacking OGAT, *this constitutes a direct conflict with the parties' understanding and agreement*." J.A.3901-3902.

Indeed, DuPont went even further, averring that it had *always believed*, *at all times* during the drafting and execution of the Agreement, that it had the right to stack OGAT with Roundup Ready®:

- "318. … Monsanto and Pioneer agreed specifically that Pioneer would not be prohibited from stacking other traits or genes, including traits or genes for glyphosate tolerance…. Monsanto was at all times aware that *Pioneer and DuPont interpreted the Soybean and Corn License Agreements in that manner during the drafting and execution* of the Agreements, while *DuPont and Pioneer were never aware that Monsanto had a countervailing interpretation*." J.A.3844-3845.

- "573. *At all times during the drafting and execution* of the Soybean and Corn License Agreements, *Pioneer and DuPont thought that these Agreements did not prohibit Pioneer from stacking* other traits or genes, including traits or genes for glyphosate tolerance, in soybean products containing Event 40-3-2 or corn hybrids containing Event NK603." J.A.3901; *see also* J.A.3902-3903 (identical ¶ 581).

- "575. Pioneer and DuPont were *mistaken … during the drafting and execution* of the Agreements." J.A.3902.

DuPont further alleged that it had *never understood* the "Licensed Field" definition in Section 2.09 of the Agreement to be a stacking restriction, claiming:

13

**CONFIDENTIAL MATERIAL OMITTED FROM THIS PAGE**

- "353. Pioneer and DuPont and Monsanto's agents *all understood* that the Licensed Field term, including *the language 'solely due to the presence of,'* in the MON810, 2001 license and in the Soybean and Corn License Agreements concerned limiting Monsanto's non-assert and *has nothing to do with stacking restrictions.*" J.A.3855.

- "354. Monsanto's agents … knew that *Pioneer and DuPont did not at any time understand the Licensed Field term to restrict Pioneer from stacking* traits or genes that provide similar protection as the licensed trait." J.A.3855.

Based on the foregoing representations, DuPont asserted reformation due to (1) mutual mistake, (2) DuPont's unilateral mistake coupled with Monsanto's knowing silence, and (3) fraudulent misrepresentation by Monsanto. J.A.3901-3906. DuPont also re-pleaded its reformation defense. J.A.3750. While noting that "it will be difficult for Defendants to prove their reformation claims," the court granted DuPont's motion for leave to file the SAAC. J.A.3725-3727.

## C. DuPont Continues To Assert Reformation While Impeding Discovery Regarding Its Subjective Beliefs

Over the next year, DuPont continued to maintain that it had always subjectively understood the Agreement to allow stacking of glyphosate-tolerance traits. DuPont further claimed that, ███████████████████████████ ████████████████████████████████████ J.A.4544; *see also* J.A.4570-4571. Monsanto was thus forced to conduct extensive and costly discovery on the reformation counterclaims, which DuPont actively impeded. *See,*

**CONFIDENTIAL MATERIAL OMITTED FROM THIS PAGE**

*e.g.*, J.A.5058-64; J.A.5778-5781(141:3-144:4); J.A.5859; J.A.5863; J.A.5881;

J.A.5934-5935; J.A.14947.

    The district court eventually intervened.  Noting ███████████████

████████████████████████████████████████████████████, the

court ████████████████████████████████████.  J.A.5779-

5781(142:13-144:4).  The court also granted Monsanto's motion to compel

production of additional documents, noting that "[a] party seeking reformation …

must demonstrate, as one necessary element of the claim, that it 'was mistaken and

had a belief that is not in accord with the facts.'"  J.A.11002 (quoting *Cerberus

Int'l Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151, 1155 (Del. 2002)).  By

asserting a reformation claim, DuPont had "injected into th[e] litigation" its

"subjective beliefs about [its] stacking rights," "'the truthful resolution of which

require[s] an examination of attorney-client communications.'"  J.A.11002-11003.

The court therefore ruled that, "[t]o the extent Defendants wish to pursue [those]

claims for reformation … they have waived [their] attorney-client privilege with

respect to legal advice concerning their stacking rights."  J.A.11002-11004.  The

court gave DuPont a choice: "either voluntarily dismiss these reformation claims or

produce to Monsanto all documents bearing on these issues."  J.A.11004.

    Spurning this last clear chance to withdraw its reformation claims, DuPont

"elected to maintain the defense of reformation for mutual mistake and unilateral

mistake" (J.A.14378) and produced documents previously withheld under a claim

of privilege (J.A.14378-14379; J.A.14947; *see also* J.A.14333).  The documents

showed that DuPont's claim of mistake was fabricated.[4]

## III.   DuPont's Internal Documents

When finally produced, DuPont's internal documents directly contradicted

its representations to the court that it had always thought the Agreement authorized

it to make and commercialize a stacked "OGAT/RR product."  Among other

things, the documents showed that:

- DuPont knew that the "solely" language in the "Licensed Field" provision—which was never removed from the Agreement— was a "stacking restriction" that would be "problematic" if DuPont introduced another glyphosate-tolerance gene into Roundup Ready® seed;

- DuPont recognized the distinction between "stacking competitive traits" and merely using such traits "as selectable markers" for development purposes, and knew it had not obtained the former rights; and

- DuPont knew that the addition of language from the 1992 Agreement addressing only the introduction of *non-glyphosate*-tolerance genes did not give DuPont freedom to create and commercialize a stacked OGAT/RR product.

---

[4]     DuPont continued to conceal key documents under an improper claim of privilege for *months after* it was ordered to produce privileged documents relating to the reformation issue.  In response to the court's May 2011 order (J.A.11001), DuPont produced some additional documents in June 2011.  But not until four months later, after further litigation and judicial intervention, did DuPont produce further documents (*see* J.A.14947), including two particularly damning documents for DuPont's reformation claims (J.A.14797; J.A.14799).

**CONFIDENTIAL MATERIAL OMITTED FROM THIS PAGE**

The documents also showed that DuPont's in-house lawyers devised their new reading of the Agreement only after the company was under serious pressure because of the failure of OGAT. Even then, those lawyers harbored grave doubts about whether DuPont's course of action was consistent with the Agreement.

### A.     2002 Documents

Documents authored during the negotiation and execution of the 2002 Agreement showed Pioneer's awareness that Section 2.09's "Licensed Field" definition restricted the stacking of glyphosate-tolerance traits. For example, on March 14, 2002, Pioneer's in-house counsel ███████ alerted DuPont negotiators that changes were needed to the definition of "Licensed Field" in the draft agreement if Pioneer wanted to "stack" glyphosate-tolerance traits:

> Attached hereto is a redline version of Monsanto's draft RR Soybean agreement. *It has been modified to remove the stacking restrictions*[.]

J.A.15021. ███████ proposed redline both removed a prohibition on using *non-Monsanto* traits and altered the "Licensed Field" definition, replacing the phrase "solely due to" with the phrase "due in whole or in part." J.A.15024. ███████ thus recognized that the definition of "Licensed Field" would not have allowed Pioneer to produce seed expressing a glyphosate-tolerance trait other than Monsanto's Roundup Ready® trait. The original definition of "Licensed Field," however, survived into the final text of the Agreement.

**CONFIDENTIAL MATERIAL OMITTED FROM THIS PAGE**

Similarly, on March 26, 2002 (just five days before the Agreement was signed), ████████, a senior Pioneer executive who negotiated and signed the Agreement, told in-house counsel and fellow negotiator ████████ that Section 2.09's "Licensed Field" definition would prevent Pioneer from introducing its own glyphosate-tolerance genes or traits into Roundup Ready® seed:

> By the way, I just found out *section 2.09 may be a problem.* The definition of Licensed Field limits us to genetically-engineered protection against Glyphosate herbicide solely due to the presence of the Glyphosate-Tolerant Soybean Event: 40-3-2. This *will be problematic for us* if we use a Glyphosate resistance gene (i.e. GAT) as a selectable marker in soybean transformation. Our 1992 agreement is not so restrictive and permits us to commercialize stacks so long as they still meet the Commercial Tolerance definition. We need to get back to that language so we are not limited in what we can do from a transformation standpoint.

J.A.14797.

The next day, ████ emailed ██████ to note the "Stacking restrictions" in the draft agreement. J.A.14299. He explained that "currently we would agree *not to stack like traits with theirs*—e.g., no Ffybes/RR stack."[5] J.A.14299. But he described such restrictions as "a walk away" *only* "to the extent it prohibits us from using *selectable markers* for our entire trait pipeline." In contrast, ██████ acknowledged: "*We probably could agree not to stack competitive traits on Monsanto's*[.]" J.A.14299. ██████ thus distinguished between the use of certain

---

[5]     "Ffybes" is "a technology that created glyphosate-tolerant plants." J.A.54 n.6 (citing J.A.14340).

**CONFIDENTIAL MATERIAL OMITTED FROM THIS PAGE**

traits as selectable markers (a right DuPont apparently wanted) and the stacking of competitive traits with Roundup Ready® (which DuPont was willing to forgo).

███ later identified "the stacking restrictions" as one of "the biggest issues" for DuPont. J.A.14298. In response, ███ listed several stacks that DuPont's negotiators were actively "trying for," all of which involved the stacking of Roundup Ready® with a *non-glyphosate*-tolerance gene or trait. *Id.* To resolve this issue, DuPont focused on removing language that prohibited the stacking of Roundup Ready® with *non-Monsanto* traits and on inserting, in Section 3.01(i), language from the 1992 Agreement that addressed the potential introduction of *non-glyphosate*-tolerance genes. *See* J.A.71; J.A.14969 (███: "This speaks to the issue of non-glyphosate herbicides but is silent on other glyphosate resistance genes.").[6]

These were important changes for DuPont with respect to stacking *non-glyphosate* herbicides with Roundup Ready®, but at no time did the parties incorporate any new language that would have changed ███████ interpretations of the Agreement as precluding the stacking of another *glyphosate*-tolerance trait with Roundup Ready®. ███████ recognized in the final days before execution of the Agreement the addition of Section 3.01(i) did not

---

[6] *Compare* J.A.14827-14828 (addressing commercialization of seed carrying a non-Monsanto gene conferring "increased tolerance to a *non-glyphosate* herbicide"); *with* J.A.661 (Section 3.01(i)) (near-identical language); *see also* J.A.14299.

necessarily give Pioneer full "[freedom to operate] on another Gly[phosate]-tolerant gene." *See* J.A.14969; *see also* J.A.71.[7]

DuPont's internal documents thus refuted its representations to the court. Far from having always believed that it had the right to create and commercialize an "OGAT/RR product," DuPont recognized throughout the negotiation process that the Agreement's language was problematic for it. DuPont nonetheless executed the final 2002 Agreement, with Sections 2.09, 3.01(a) and 3.01(g)(iv) operating to prevent any development, use, production, sale, or importation of glyphosate-on-glyphosate stacks.

### B. 2007-2008 Documents

DuPont's documents also revealed that, five years later, when OGAT failed as a stand-alone trait, DuPont again recognized the difficulties that the Agreement presented to its fallback plan of marketing an OGAT/RR stack. For example, in a July 10, 2007 email, ███████ wrote:

> Monsanto would *likely argue* that the stack of GAT and 40-3-2 is not allowed under the terms of the license agreement. The main grant section of the license, section 3.01, provides: [text of Section 3.01(a)]
>
> *As you can see, the license grant[] is limited to "within the Licensed Field".* That term is defined in the agreement in section 2 [as]

---

[7] The same email assumed—without explanation—that Pioneer "would not be blocked against using another glyphostate [sic] resistance gene *as a selectable marker*." J.A.14969. But it did not draw a similar conclusion regarding commercial use of a second glyphosate-tolerance gene.

**CONFIDENTIAL MATERIAL OMITTED FROM THIS PAGE**

> 2.09 … Licensed Commercial Seed which exhibit genetically-engineered protection against Glyphosate herbicide solely due to the presence of the Glyphosate-Tolerant Soybean Event: 40-3-2.

J.A.14317. While ███████ noted potential "arguments to allow the stack you are requesting"—suggesting, for example, that Section 3.01(e) lacked a direct Licensed Field limitation—this correspondence clearly recognized that the plain language of the License Agreement, and in particular Section 2.09's "Licensed Field" definition, does not permit stacking glyphosate-tolerance traits.  J.A.14317.

This understanding is confirmed by DuPont's renegotiation of its license to YieldGard, a Monsanto trait in corn conferring resistance to lepidopteran insects. The original YieldGard license, which DuPont acknowledged was a model for the 2002 Agreement (*see* J.A.3846; J.A.3851-3852), contained a similar "Licensed Field" definition, limiting Licensed Corn Products to those that "exhibit genetically-engineered protection against lepidopteran insects *solely due* to the presence of the B.t. Corn Event-MON810."  J.A.62; J.A.5886-5887 (Section 2.07). To permit DuPont to stack Monsanto's YieldGard trait with other lepidopteran-resistance traits, ██████ sent ████ "[s]ome suggested changes re stacking" providing: "Section 2.07 will be amended to *delete the phrase 'solely due* to the presence of the B.t. Corn Event-MON810'."  J.A.14307-14308.  Similarly, another in-house attorney for Pioneer, sent ██████████ a draft redline of the YieldGard license that commented directly on ██████ deletion of the "solely"

**CONFIDENTIAL MATERIAL OMITTED FROM THIS PAGE**

language: "Make same changes for [MON]863 license—*take out stacking restrictions*." J.A.14803-14804.

Other internal communications show that DuPont understood that it had no right to *commercialize* an OGAT/RR stack. On August 29, 2007, ▮▮▮▮ wrote to others at Pioneer: "We might be able to really accelerate timelines *if* we can sell a stacked product of 40-3-2 and GAT. *Questionable whether we have the right to do so now*…." J.A.14275. Echoing that doubt about a month later, ▮▮▮▮ and ▮▮▮▮ concluded that Pioneer had "no commercial rights" to an OGAT/RR stack "[b]ecause of the field of use limitation in 3.01(a)." J.A.14799.

DuPont continued to express doubts internally about its right to create and commercialize an OGAT/RR stack. On January 19, 2008—just one week before DuPont made the decision to abandon OGAT as a stand-alone trait—



▮▮▮▮, wrote to ▮▮▮▮, expressing concern about the potential impact on DuPont's business if it failed to obtain such stacking rights:

> *[I]f we don't get stack rights* we are dependent on either Gat which is not going well in soy as a source of gly[phosate tolerance] or an alternative gat event or some other Gly[phosate tolerance] source event. … On the other hand, *if we had RR GAT stacking rights* I suspect we will be yield advantaged against RR2Y.



J.A.14281; J.A.14278(21:9-13).  That same day, ███████ and ████████████

██████████████████████ discussed the value of stacking but were advised

by ████████ that DuPont lacked rights to commercialize an OGAT/RR stack:

> ████████:  "Do we feel we have stacking rights with RR today or not,
> I am not clear on this…."

> ████████:  "Check with ██████████ but I am sure we do have
> stacking rights."

> ████████:  "Just did *we don't have commercial rights*."

J.A.14291.

Only as DuPont's leadership reached the final decision to abandon OGAT as

a stand-alone trait did DuPont's in-house lawyers move their own legal position

toward a more aggressive reading of DuPont's rights under the 2002 Agreement.

The documents show those lawyers struggling to persuade themselves to adopt a

new position that they fully understood was difficult to reconcile with the language

of the Agreement.  In January 2008, ████████ wrote to ██████ that "the key

limitation is the Licensed Field," which "seems to *limit the ability to stack GAT*

*plus RR*."  J.A.14318.  ████████ argued that this restriction did not prohibit the

*introduction* of another glyphosate-tolerance gene under Section 3.01(e) of the

Agreement, but even then "[a] conservative reading says we can stack but may not

be able to commercialize, a potentially useless right."  *Id.*  ████████ then

attempted to construct a "better argument" that might permit Pioneer "to commercialize the stack." *Id.*

Thus, under serious economic pressure to erase Monsanto's lead in glyphosate tolerance, DuPont finally arrived at a tortured reading of its rights under the Agreement that it knew as early as 2002 was inconsistent with the Agreement's text. DuPont's push to commercialize its "OGAT/RR product" continued until shortly before trial in 2012, when it was advised by its outside counsel to "discontinue commercialization" "asap." J.A.34024; J.A.31471.

## IV. DISTRICT COURT PROCEEDINGS ON MONSANTO'S MOTION FOR SANCTIONS

### A. Monsanto's Motion For Sanctions And DuPont's Response

Based on the contradictions between DuPont's internal documents and DuPont's earlier representations to the court, Monsanto moved for sanctions, asking the court to dismiss DuPont's breach-of-contract affirmative defenses and counterclaims and to award Monsanto its attorney's fees and costs incurred in litigating all breach of contract issues. J.A.14248-14249; J.A.14266-14267.

In response, DuPont continued to make statements contradicted by its internal documents. *See* J.A.14326; J.A.14334-14336; J.A.14338; J.A.14340-14341; J.A.14343; J.A.14350. For example, DuPont argued that it had "always understood the [License Agreement] to provide the right to combine [OGAT] with Roundup Ready." J.A.14326. DuPont said that this was "its belief at the time of

contracting and today." J.A.14334-14335. DuPont also asserted that it "believed and continues to believe" that "it negotiated for the right to make and sell OGAT Roundup Ready" and that "the Licensed Field definition was not intended to be a prohibition on stacking." J.A.15111(43:2-11); *see also* J.A.15133(65:8-14); J.A.15178(110:1-12).

On November 30, 2011, Judge Webber held a lengthy hearing on Monsanto's motion. *See generally* J.A.15069-15071; J.A.15189-15190. DuPont did not submit an affidavit from any current or former employee or present any live witnesses. *See* J.A.15157-15158(89:1-90:12).

### B.    The District Court's Order

#### 1.    Factual Findings

On December 21, 2011, the district court concluded that DuPont had "knowingly and in bad faith made false misrepresentations … that are clearly refuted by [its] internal documents." J.A.75. Notably, the court concluded that DuPont's position that it "*always* believed that the [Agreements] provided [it] with the right to stack and commercialize" multiple glyphosate-tolerance traits—a position that "provides the basis for many of [DuPont's] breach of contract defenses and reformation counterclaims"—"was never rooted in fact" and was instead "a fabrication based on … false misrepresentation[s] to the Court." J.A.46

(emphasis in original). The court therefore exercised its inherent authority to grant Monsanto's motion for sanctions.

The court analyzed a series of misrepresentations regarding DuPont's *subjective understanding* of the Agreement, each of which it concluded would support sanctions in its own right. First, the court found that "[b]y repeatedly stating that they *believed* they had [the] right to sell stacked RR/OGAT seeds, Defendants have deceived the Court." J.A.52. Among other things, DuPont's own emails had stated "we don't have commercial rights" and there are "no commercial rights" "[b]ecause of the field of use limitation in 3.01(a)." J.A.50. The court rejected as "[im]plausible" DuPont's assertions that these and other emails reflected only internal lawyers' conservative legal advice. J.A.51-52.

Second, the court found that Defendants had repeatedly and falsely represented that "they *always believed* that they ha[d] the right to stack OGAT … with [Roundup Ready®]." J.A.55-56 (emphasis in original). Among other things, DuPont recognized before executing the 2002 Agreement that the "Licensed Field" provision—which was never altered—prevented it from making a *glyphosate-on-glyphosate* stack (J.A.54), and that the only stacks covered by Section 3.01(i) of the Agreement were for *non-glyphosate* herbicides (J.A.55-56). The court also found DuPont's post hoc evidence unpersuasive, as the "integrity" of ▮▮▮▮ deposition testimony was "call[ed] into question" by his 2002 email

acknowledging the "problematic" "Licensed Field" provision (*see* J.A.57-59; J.A.69-70), and testimony by a DuPont executive actually conceded DuPont's awareness in 2002 that Monsanto was "'pushing back' and wanted stacking restrictions" (J.A.56-57).

Third, the court found that DuPont had falsely stated to the court on several occasions that it never believed that the "Licensed Field" definition (Section 2.09) had any relation to stacking.[8]  Among other things, DuPont's 2002 documents had referred to the definition as a "stacking restriction[]" and recognized that it was "a problem" for DuPont.  J.A.60-61.  DuPont had also targeted the same definition when it sought to remove the stacking restrictions in the YieldGard agreement.

Finally, the court rejected DuPont's various arguments against sanctions. The court emphasized DuPont's statement that it had "conduct[ed] additional investigations" and that its amended reformation counterclaims were "the product of those ongoing, good faith investigations."  J.A.66 (quoting J.A.2745).  Further, although DuPont contended that disclosing the damaging internal emails rather than withdrawing its reformation claims showed good faith, the court concluded that "in this case, an intent to defraud does coincide with a voluntary production of self-destructive documents" because the parties' "bitter corporate rival[ry] … has

---

[8]     The court divided its analysis of this misrepresentation into three closely-related sections.  The first addressed DuPont's belief before the Agreement was executed.  J.A.60-63.  The second and third addressed DuPont's beliefs at later points of time.  J.A.63-64.

clouded [DuPont's] judgment." J.A.68. Finally, the court rejected DuPont's argument that its internal documents, read "in context," actually supported its repeated assertions that it believed it had a contractual right to prepare and commercialize an OGAT/RR stack. J.A.69-75.

## 2. Remedy

The court narrowly tailored a remedy directed at the reformation claims that DuPont's false representations had kept alive. The court concluded that it should strike DuPont's reformation claims as "the only means to deter [DuPont's] misconduct and preclude [it] from continuing this behavior that is an abuse of the judicial process." J.A.75-76. The court also ruled that, because DuPont "ha[d] acted in bad faith," Monsanto was entitled to attorney's fees. J.A.78. The court found that DuPont's misrepresentations had "abused the judicial process" and "caused substantial expense to Monsanto," which was forced to "defend itself against bogus, factually unsupported allegations." J.A.77-78; *see also* J.A.52; J.A.59; J.A.63-64. Again, however, the court limited the remedy, granting Monsanto only those fees incurred in responding to DuPont's specious reformation defense and counterclaims—not any other defenses or counterclaims. J.A.78-79.

In January 2012, Monsanto submitted an itemized list of fees and costs. J.A.15600; J.A.15616-15766. DuPont did not object to this submission. J.A.40;

J.A.15598.  The court found ███████████████████████████████████████

███████████████. J.A.40-41.

## V.  REMAINING DISTRICT COURT PROCEEDINGS

On June 6, 2012, the court granted Monsanto summary judgment on its

breach of contract claims and DuPont's license affirmative defense.  J.A.26582-

26583; J.A.26596.  The court held that, by creating an OGAT/RR stack, DuPont

"breached the obligations contained within [both Section 3.01(a) and 3.01(g)(iv)],"

which "are limited by the Licensed Field, which prohibits the stacking of

glyphosate-resistant traits."  J.A.26576-26582.

The case proceeded to trial on Monsanto's patent infringement claim.  The

jury returned a verdict for Monsanto, finding all asserted claims valid and

infringed.  J.A.31455-31459.  Monsanto and DuPont ultimately reached a business

agreement that included a resolution of their entire dispute except for the sanctions

order.  J.A.33979-33984.  On March 26, 2013, the parties stipulated to dismiss

with prejudice all claims and counterclaims and jointly moved for final judgment

on the sanctions order.  J.A.33976-33984.  On the same day, the court dismissed

the case with prejudice and entered final judgment.  J.A.1-4.  This appeal followed,

limited to the district court's decision to award attorney's fees as a sanction.[9]

---

[9]     Because DuPont stipulated to the dismissal of its counterclaims and
defenses, it cannot appeal the district court's decision to strike its reformation
claims and defenses as a sanction; nor can it appeal the court's construction of the

## SUMMARY OF ARGUMENT

I.    The district court properly sanctioned DuPont for repeatedly misrepresenting its subjective beliefs about the 2002 Agreement when pressing its reformation claims. Those claims placed at issue DuPont's subjective understanding of the Agreement, and DuPont supported its reformation claims with representations that it had *always believed* (at least until 2008) that the parties had agreed to allow DuPont to make a cross-bred, stacked "OGAT/RR product." As the court found, however, those representations were directly contradicted by the evidence and knowingly false when made.

DuPont's 2002 negotiation documents show that DuPont realized that the Licensed Field provision was a "stacking restriction" that would be "problematic" if DuPont attempted to combine Roundup Ready® traits with other glyphosate-tolerance traits. Yet DuPont never negotiated any change to that provision. Moreover, DuPont knew that the addition of the 1992 language in Section 3.01(i) addressed only the stacking of Roundup Ready® with *non*-glyphosate resistance genes and did not give it freedom to make and commercialize stacks expressing a second *glyphosate*-tolerance gene. The 2007-2008 documents further undermined DuPont's assertion that it always believed it had obtained full stacking rights.

---

2002 Agreement, reflected in the court's orders granting Monsanto partial judgment on the pleadings and partial summary judgment. *E.g.*, J.A.2254; J.A.3720; J.A.26574-26575; J.A.26582-26583; J.A.26596.

Those documents showed that when DuPont was deciding whether to bring an OGAT/RR product to market, the negotiators of the 2002 Agreement still doubted DuPont's ability to do so.

The court's factual findings regarding DuPont's knowingly false statements, the materiality of its misrepresentations, the pervasiveness of DuPont's conduct, and its effect on the litigation amply support the finding of "bad faith" necessary to award attorney's fees under the court's inherent powers. This Court owes substantial deference to the district court's carefully considered and narrowly tailored sanction.

II.    DuPont has failed to carry its heavy burden of demonstrating that the district court abused its discretion.

A.    The district court did not sanction DuPont for making arguments about the objective meaning of the 2002 Agreement. Rather, the court properly sanctioned DuPont for misrepresenting its *subjective* beliefs about the Agreement and narrowly tailored its remedy to the claims that depended on those misrepresentations of subjective belief.

B.    DuPont argues for the first time on appeal that because it allegedly believed it could use glyphosate-resistance genes as selectable markers, it must have thought it could create a commercial breeding stack of OGAT and Roundup Ready®. This argument is waived, wrong as a matter of science, and contradicted

31

by DuPont's own documents.  Although DuPont attempts to equate selectable markers with commercial stacks, the two are by no means the same.  Selectable markers are research tools that do not necessarily confer commercial-level tolerance and can be excised from the genome before commercialization.  Indeed, DuPont's negotiators recognized this during negotiations of the Agreement, stating that DuPont wanted "to use LL, GATT [sic], and maybe others someday, as selectable markers" but "probably could agree not to stack competitive traits on Monsanto's."  J.A.14299.

C.    DuPont's assertion that the corporation was improperly sanctioned for the views of individual employees is baseless.  DuPont was sanctioned for its false statements *to the court* during this litigation.  Moreover, the internal documents contradicting those statements are clearly attributable to the corporation; they were authored by the top in-house attorneys and executives who negotiated and signed the 2002 Agreement.

D.    The district court properly considered documents from 2007-2008 in ordering sanctions.  Those documents contained the views of in-house attorneys involved in the negotiations and reinforced their earlier statements by showing that, even as late as 2007 and 2008, when DuPont was seeking to bring its OGAT/RR stack to market, DuPont still harbored doubts that its activities were permitted under the Agreement.  The statements also contradicted DuPont's

32

representation that it continued to believe (at least until 2008) that it had full

stacking rights.

E.      DuPont's complaint that the court improperly adjudicated its

reformation claim on the merits fails at the outset because the only issue before this

court is the award of attorney's fees.  Nor has DuPont established error, let alone

an abuse of discretion.  Dismissal of a claim is a serious remedy, but in this case it

was proportional to the seriousness of DuPont's misconduct.  In any event,

reformation requires that a party demonstrate—beyond serious doubt—that despite

the clear text of an agreement, the parties came to a different understanding.

DuPont's meager evidence, produced only under compulsion, fails to meet this

strict standard.

F.      DuPont errs in urging an overly stringent standard for "fraud on the

court" requiring the most "egregious" misconduct.  That rigorous standard applies

only where a court imposes a much more severe sanction, such as reopening a

long-final judgment or dismissing an entire case.  Where, as here, a court awards

attorney's fees for litigation misconduct, it is sufficient that the court properly find

that the party acted in bad faith to abuse the judicial process.

## STANDARD OF REVIEW

Under controlling Eighth Circuit law, this Court "review[s] all aspects of the

imposition of sanctions under an abuse of discretion standard."  *Harlan v. Lewis,*

982 F.2d 1255, 1259 (8th Cir. 1993) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32

(1991)); *see also Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374,

379 (Fed. Cir. 1994).  A reviewing court must "give substantial deference to the

district court's determination as to whether sanctions are warranted because of [the

district court's] familiarity with the case and counsel involved." *Willhite v.

Collins*, 459 F.3d 866, 869 (8th Cir. 2006).

## ARGUMENT

DuPont's brief proceeds from the false premise that the district court

sanctioned it for making legal arguments about the meaning of the 2002

Agreement.  In reality, the court sanctioned DuPont for making false

representations of fact about its subjective understanding of the Agreement.

Indeed, DuPont previously described the sanctions order as █████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████     J.A.23739 n.2.  Both the court's factual findings and its

remedy were tailored to DuPont's bad faith misrepresentations regarding those

beliefs, and the court acted well within its discretion when it sanctioned DuPont for

abusing the judicial process.

## I. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION BY IMPOSING SANCTIONS BASED ON DUPONT'S FALSE REPRESENTATIONS CONCERNING ITS SUBJECTIVE BELIEFS ABOUT THE 2002 AGREEMENT

### A. The District Court Had Inherent Power To Award Attorney's Fees Based On DuPont's Bad-Faith Abuse Of The Judicial Process

A court may order a party to pay attorney's fees under its inherent power if the court finds that the party acted in bad faith to interfere with or abuse the judicial process. *See, e.g.*, *Chambers*, 501 U.S. at 44-45, 50; *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766-767 (1980); *Gas Aggregation Servs. v. Howard Avista Energy, LLC*, 458 F.3d 733, 739 (8th Cir. 2006); *Willhite*, 459 F.3d at 870 ("[A]n award of attorney's fees is permissible under a court's inherent powers as long as the person being sanctioned has demonstrated bad faith.").

As *Chambers* and its progeny establish, *any* "bad faith" conduct that "abuses the judicial process" is sufficient to support an attorney's fees award, including any intentional concealment or misrepresentation of facts, any advancement of frivolous claims to harass or delay, or any other conduct that "delays or disrupts" the litigation. *See, e.g.*, *Chambers*, 501 U.S. at 46 (bad faith shown by "delaying or disrupting the litigation or hampering enforcement of a court order"); *Gas Aggregation*, 458 F.3d at 736-737, 739 (bad faith shown by deliberate concealment and misrepresentation of key facts); *Harlan*, 982 F.2d at 1260 (bad faith shown by intentional disruption of discovery process).

35

The court committed no error in finding, based on the documents DuPont was compelled to produce, that DuPont had misrepresented its subjective beliefs about the meaning of the 2002 Agreement and therefore acted in bad faith. Under controlling Eighth Circuit law, this determination is entitled to "substantial deference." *Willhite*, 459 F.3d at 869. This Court may not substitute its judgment for that of the district court and may find clear error only when it is "left with the definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001); *see Lee v. L.B. Sales, Inc.*, 177 F.3d 714, 718 (8th Cir. 1999).

### B. The District Court Properly Found, Based On DuPont's Internal Documents, That DuPont Had Misrepresented Its Subjective Beliefs About The 2002 Agreement

#### 1. DuPont placed its subjective beliefs at issue by pressing its reformation claim

DuPont's reformation claim placed its subjective understanding of the Agreement at the center of the case. Under Delaware law, a contract may be reformed, in rare instances, when the written instrument fails to express the parties' prior agreement because of mutual mistake, a unilateral mistake coupled with knowing silence, or fraud by one party. *See Cerberus*, 794 A.2d at 1151; *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 679-680 (Del. 2013). When a party seeks to reform a contract, it must prove (at a minimum) that (1) before executing the written instrument, "the parties

came to a specific prior understanding that differed materially from the written agreement," and (2) it *mistakenly believed* that the final, executed contract accurately expressed that prior understanding. *See Cerberus*, 794 A.2d at 1151-1152, 1155. Both elements must be established by clear and convincing evidence, "free from doubt." *Hob Tea Room, Inc. v. Miller*, 89 A.2d 851, 856-857 (Del. 1952); *see also Cerberus*, 794 A.2d at 1150, 1152. Because "[t]he presumption is that [] parties executing [] a formal agreement intended what they said," "[t]he clear language of a formal instrument, duly executed, may not be lightly set aside." *Hob Tea Room*, 89 A.2d at 856.

Once the district court held that the Agreement objectively prohibited DuPont from stacking OGAT with Roundup Ready®, DuPont's reformation claims became pivotal to the survival of both its litigation defense and its business plans. DuPont had admitted to creating, with the intent to commercialize, a stacked OGAT/RR "product" in which OGAT conferred field-level glyphosate tolerance. *See, e.g.*, J.A.3754; J.A.3761; J.A.3764-3765; J.A.3778; J.A.3842. The only way for DuPont to get such rights was to convince the court that the Agreement should be "reformed." DuPont therefore sought and obtained leave to amend its pleadings to add detailed allegations to support its reformation claims and defense.

In addition to asserting that the parties "specifically" intended to allow the stacking of OGAT and Roundup Ready® in commercial seed and "never intended"

**CONFIDENTIAL MATERIAL OMITTED FROM THIS PAGE**

for the Licensed Field provision "to be … a stacking restriction" (J.A.3844-3845; J.A.3852), DuPont asserted that it subjectively "thought," "[a]t all times during the drafting and execution of the [Agreement]," that the Agreement allowed the stacking of other glyphosate-tolerance traits like OGAT in commercial products (J.A.3901-3902). It also requested that the district court "reform the [Agreement] to allow" "*any* conduct by Pioneer with regard to its ████████████ ████████" "in accordance with Monsanto and Pioneer's intent." J.A.3844. *See also* pp. 12-14, *supra* (detailing allegations). It was those assertions, and similar ones regarding DuPont's *subjective* beliefs, that the district court found to be knowingly false and sanctionable.

### 2. DuPont misrepresented its subjective beliefs about the 2002 Agreement

The court found that "Defendants have repeatedly and systematically made and continue to make false representations to the Court about their subjective beliefs regarding stacking rights and restrictions." J.A.76. The court reached this conclusion after thoroughly reviewing the entire documentary record, including evidence presented by DuPont. *See, e.g.*, J.A.51; J.A.55-56; J.A.62; J.A.64-69 (discussing each of DuPont's proffered documents, deposition excerpts, and counterarguments). The court even systematically *re*-reviewed key documents in chronological order, as DuPont requested. *See* J.A.69-75 & n.13. The court then correctly determined that the core representations advanced by DuPont in support

**CONFIDENTIAL MATERIAL OMITTED FROM THIS PAGE**

of reformation—(1) DuPont always believed the Agreement authorized it to stack another glyphosate-tolerance trait with Roundup Ready® in commercial seed; (2) DuPont never understood the "solely" language of the Licensed Field definition to be a stacking restriction until 2008; and (3) DuPont believed and continues to believe that it obtained the right to commercialize its OGAT/RR soybean product—are directly contradicted by DuPont's internal communications.

The court correctly found that DuPont clearly recognized before execution of the 2002 Agreement that the Licensed Field provision would be "problematic" if DuPont attempted to introduce another glyphosate-tolerance gene into Roundup Ready® seed for *any* purpose. DuPont's documents show that "█████, the Pioneer vice president and signator of the 2002 RR license agreements, knew days before the execution of the agreements that section 2.09, the definition of Licensed Field, restricts Pioneer's use of the 40-3-2 soybean event and does not allow stacking RR with their OGAT trait." J.A.59; *see also* J.A.59 n.9; J.A.63; J.A.69-70. █████ March 26, 2002 email to █████ expressly recognized that "section 2.09 may be a problem" because "[t]he definition of *Licensed Field limits us* to genetically-engineered protection against Glyphosate herbicide *solely due* to the presence of the Glyphosate-Tolerant Soybean Event: 40-3-2." J.A.58, J.A.61, J.A.69 (quoting J.A.14797). █████ concluded that the Licensed Field provision "*will be problematic*" for Pioneer, even if it merely "use[d] a Glyphosate resistance gene

**CONFIDENTIAL MATERIAL OMITTED FROM THIS PAGE**

(i.e. GAT) *as a selectable marker*[,]" let alone if it prepared and marketed a

commercial breeding stack of OGAT/RR.  J.A.14797.  Yet the language of Section

2.09 did not change to eliminate the stacking restriction.  J.A.59.

The court also properly found that DuPont's documents refuted its assertion

that it never understood the "solely" language of the Licensed Field definition to

restrict stacking until 2008.  DuPont explicitly referred to this term (and to parallel

terms in related agreements) as a "stacking restriction."  ████ email and redline

of March 14, 2002 showed the Licensed Field definition was a term "that

*Defendants believed* [was] related to stacking, which needed to be changed to

permit the desired stacking rights."  J.A.62 (emphasis in original).  In that

correspondence, ████ indicated that he had edited a draft of the agreement "to

remove the *stacking restrictions*" by, *inter alia*, striking the word "solely" from the

Licensed Field definition.[10]  J.A.15021; J.A.15024.  But this term was never

changed.

Likewise, the court correctly found that ████ August 17, 2007 email

redlining the amended YieldGard license, when read in view of ████ near-

identical earlier edits to the 2002 Agreement, confirmed that "as of March 14,

---

[10]    ████ also proposed removing other provisions restricting stacking,
including former Section 3.01(h) requiring approval to stack any non-Monsanto
herbicide-tolerance trait and former Section 3.05(b) restricting commercialization
of seed stacked with a non-glyphosate-tolerance gene other than ALS.  But ████
still understood and explained that *the Licensed Field definition* operated to restrict
the stacking of *glyphosate*-tolerance genes and traits.  J.A.62.

**CONFIDENTIAL MATERIAL OMITTED FROM THIS PAGE**

2002, Defendants were aware that the 'Licensed Field' definition related to stacking restrictions." J.A.61-63. Just as ████ March 2002 email had proposed "remov[ing] the stacking restrictions" by striking the word "solely" from the Licensed Field definition, ████ 2007 email proposed "suggested changes re stacking," including amending the Licensed Field definition to "delete the phrase 'solely due to the presence of the B.t. Corn Event-MON810.'" J.A.61-62 (quoting J.A.14307-14308); *c.f.* J.A.14803-14804. The 2007 YieldGard edits thus reinforced that DuPont understood the Agreement's "solely" language was "related to stacking"—directly contrary to its representations to the court. J.A.62-63.[11]

DuPont's documents also contradicted its representation that it subjectively believed it could commercialize a glyphosate-on-glyphosate stack. For example, in a March 28, 2002 email thread, ████ proposed the addition of language similar to that in the 1992 agreement, which had allowed DuPont, with prior written consent from Monsanto, to commercialize Roundup Ready® seed that also included genes conferring tolerance to a "non-glyphosate herbicide." J.A.14969. In response, ████ remarked that "This [1992 language] speaks to the issue of *non-glyphosate* herbicides but is *silent on other glyphosate resistance genes*." *Id.*

---

[11]     Similarly, the court properly found that ████ March 27, 2002 email, which explained that "'currently we would agree *not to stack like traits* with theirs—e.g., no Ffybes/RR stack,'" "confirms Defendants' knowledge of stacking restrictions that Defendants needed to eliminate from the 2002 license agreements." J.A.70 (quoting J.A.14299).

As the court found, ▮▮▮ understood that the proposed 1992 language—which became Section 3.01(i) in the executed agreement—gave DuPont *only* the right to introduce *non-glyphosate* herbicide resistance traits, *not* "the freedom to stack glyphosate on glyphosate-tolerant traits." J.A.71. This view is supported by ▮▮▮ recognition, in the same email chain, that even if Section 3.01(i) did not expressly prohibit use of a glyphosate-tolerance gene as a selectable marker, that would "not necessarily mean we have [freedom to operate] on another Gly[phosate]-tolerant gene." *Id.* (quoting J.A.14969).

The court thus properly found that, in contrast with DuPont's ability to introduce and commercialize *non-glyphosate* herbicide resistance traits under Section 3.01(i), DuPont was "aware" that it did not obtain such freedom with respect to *glyphosate*-resistance traits. J.A.71. The court also correctly found that the ultimate adoption of Section 3.01(i) did not eliminate DuPont's subjective understanding that the Licensed Field definition in Section 2.09 was a "problematic" "stacking restriction." J.A.58-59; J.A.72; J.A.74.

Indeed, as the court found, the same DuPont executives and lawyers who had negotiated the 2002 Agreement continued to question or deny their right to commercialize an OGAT/RR stack even into 2008. *See* J.A.50-51; J.A.72; *see also, e.g.*, J.A.14275 ("Questionable whether we have the right" to "sell a stacked product of 40-3-2 and GAT"); J.A.14291 ("we don't have commercial rights");

J.A.14318 ("may not be able to commercialize"); J.A.14799 ("no commercial rights"). Such statements are inconsistent with a belief that they had obtained that right in 2002.

DuPont's own documents thus fully support the court's findings that DuPont misrepresented its subjective beliefs.[12] At most, DuPont might have thought it had received (a) the right to stack Roundup Ready® with genes conferring *non-glyphosate* herbicide tolerance, under certain conditions, and (b) perhaps, authority to introduce another glyphosate-tolerance gene into Roundup Ready® plant cells *as a selectable marker*. But, contrary to DuPont's repeated representations to the court, DuPont fully recognized both during and after the 2002 negotiations that the Agreement did not give DuPont the right to create and commercialize its "OGAT/RR product." DuPont has fallen far short of demonstrating any error, much less that the court's findings on this critical point were clearly erroneous.

---

[12]     DuPont's choice to produce documents that directly refuted its representations, rather than withdraw its reformation claims, stemmed from DuPont's "fight-to-the death mentality" against its "bitter corporate rival[]" in this litigation. J.A.68. That perspective ultimately "clouded [DuPont's] judgment" and convinced it to proceed with its unfounded reformation claims. *Id.* It is certainly not unheard of for a party to pursue meritless claims. *See, e.g., First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 522-525 (6th Cir. 2002); *Coleman v. Commissioner*, 791 F.2d 68, 72-73 (7th Cir. 1986). DuPont "could have avoided [its] penalty" by dropping its reformation claims but, having chosen not to do so, now "must pay the cost." *Coleman*, 791 F.2d at 73.

### C. The District Court Properly Found That DuPont Acted In Bad Faith

The court made ample findings of misconduct that, taken together or individually, constitute bad faith that is sanctionable under the court's inherent power to assess attorney's fees. *First*, as to each separate misrepresentation, the court compared DuPont's litigation statements to the documentary evidence of DuPont's actual beliefs, considered DuPont's specific counterarguments and evidence, specifically found that DuPont "knowingly" made false statements, and concluded that each of DuPont's misrepresentations independently "warrant[ed] sanctions" or was "sanctionable" as an "abuse of the judicial process." J.A.52; J.A.59; J.A.63-64; J.A.75.

*Second*, the court properly found DuPont's misrepresentations to be material. For example, the court found that DuPont's misrepresentation that it "*always* believed" it had the right to create and commercialize an OGAT/RR product "*provide[d] the basis* for many of [DuPont's] breach of contract defenses and reformation counterclaims." J.A.46. The court also repeatedly noted that DuPont's misrepresentations related to issues "critical" and "essential" to its claims. J.A.64; J.A.68; J.A.76. Indeed, had DuPont not actually believed that the Agreement permitted DuPont to make and sell its OGAT/RR product, DuPont would not have been entitled to reformation. DuPont's misrepresentations thus

44

kept its reformation claims alive long after DuPont had run out of other options to try to commercialize its OGAT/RR product.

*Third*, the court properly found that DuPont's misstatements were not isolated deviations, but were "repeatedly and systematically" practiced. J.A.76; *see also* J.A.46; J.A.52; J.A.59-60; J.A.62-63; J.A.76; J.A.78. The court further found that DuPont persisted in pursuing its baseless reformation claims, despite having opportunities to abandon them—precisely the sort of obstinate conduct that the sanction of attorney's fees is meant to remedy. *See* J.A.67-69; J.A.76-78; *see also Chambers*, 501 U.S. at 46 (noting that an attorney's fees sanction "serves the dual purpose of vindicating judicial authority … and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy" (internal quotation marks omitted)).

*Finally*, the court found that DuPont's misconduct prolonged the already lengthy proceedings and caused the court and Monsanto needless effort and expense, thus abusing the judicial process. *See* J.A.52; J.A.77-78. The court thus correctly found DuPont acted "vexatious[ly]" and in "bad faith." J.A.78.

### D. The District Court Imposed A Narrowly Tailored Sanction

Faced with DuPont's repeated and deliberate misrepresentations, the court addressed the situation fairly, carefully, and thoroughly. The court's decision to impose sanctions came, not after a summary analysis as DuPont claims (Br. 1), but

after a fair and systematic review of DuPont's proffered evidence and counterarguments (*see* J.A.65-75). The result was an opinion that went no further than necessary to address and deter DuPont's misconduct. The court struck only DuPont's specious reformation claims, not its antitrust claims or any non-reformation contract defense or counterclaim. *Id.* Moreover, the court declined to render judgment on the remaining contract-interpretation issues. J.A.16703-16704. By limiting the sanction to DuPont's specific misconduct—*i.e.*, its assertion of baseless reformation claims flatly contradicted by its own documents—the court acted well within its broad discretion.

## II. DuPont's Objections To The Sanctions Order Lack Merit

### A. The Court Sanctioned DuPont For Repeated Misrepresentations, Not Objective Advocacy

DuPont argues that the court improperly sanctioned it for making legal arguments about the interpretation of the Agreement and notes a handful of supposedly objective statements cited in the sanctions order. Br. 30 (citing J.A.52, 62-64). But this argument is refuted by both the language and scope of the court's sanctions order, which targeted only DuPont's bad-faith conduct in misrepresenting its subjective beliefs about the meaning of the Agreement.[13]

---

[13]     *E.g.*, J.A.59 (Defendants falsely told "the Court, repeatedly, that they *always believed* that under the license agreement[], they always had the right to stack RR traits with OGAT traits"); J.A.62-63 (proposed changes to "the Licensed Field definitions … were changes that *Defendants believed* were related to stacking" and

The only sanctions imposed on DuPont related directly and exclusively to its misrepresentations of subjective belief. The court struck only DuPont's reformation claims, which were based on DuPont's subjective beliefs, and allowed DuPont's remaining contract-interpretation and antitrust claims to proceed. J.A.76. It also confined the attorney's fees award to fees Monsanto incurred in responding to the reformation claim *after January 29, 2010*—the date DuPont moved the court to reinstate its reformation claims. J.A.78; J.A.2320-2322.

Moreover, the court explicitly connected the fee award to DuPont's misrepresentations of subjective belief. The section of the court's opinion awarding attorney's fees began: "Defendants have repeatedly and systematically made and continue to make false representations to the Court about their *subjective beliefs* regarding stacking rights and restrictions." J.A.76. In explaining the harm to Monsanto, the court likewise noted: "Defendants have made a mockery of this proceeding and delayed this litigation by their insistence that they *believed* they had the right to stack and commercialize RR and OGAT." J.A.77.

The court's targeted relief in no way depended on or reflected an attempt to punish DuPont for permissible advocacy regarding the objective meaning of the

---

were evidence of Defendants' misrepresentations); J.A.63 (Defendants' statements in the SAAC and Opp. to the Motion to Dismiss were "factual misrepresentations" about what "*Defendants knew* before 2008"); J.A.74 ("Defendants *knew* that they lacked these rights, and yet, they stated throughout two years of litigation that they negotiated for [these] rights and *always believed* that they had these rights.").

2002 Agreement.  By the beginning of the sanctions period in January 2010, the court had already rejected DuPont's core legal arguments regarding the interpretation of the Agreement and granted Monsanto partial judgment on the pleadings.  The fees awarded were thus by definition incurred after the focus had shifted to DuPont's subjective understanding of the Agreement.  Further, even though the court cited a few purportedly "objective" contract-interpretation arguments proffered by DuPont *before* January 2010 (*e.g.*, in DuPont's Response to Monsanto's Motion for Partial Judgment on the Pleadings, *see* J.A.1223; J.A.1228-1229; *see also* J.A.1937), such arguments were clearly *not* the basis for the award of attorney's fees, other than to the extent that they encompassed implicit misrepresentations regarding DuPont's *subjective* belief.  *See* J.A.33962 ("the primary findings of the Sanctions Order concern the Defendants' actual knowledge and understanding of their stacking rights" and "Defendants' continued misrepresentation to the public and the Court, contrary to their true subjective knowledge, that they always believed that they had those rights").

The context surrounding the court's alleged reliance on "objective" statements further undermines DuPont's argument.  For example, DuPont selectively points to the court's recitation of DuPont's assertion that the "'Licensed Field' merely defines the limit on Monsanto's promise not to sue [Pioneer] for patent infringement."  Br. 30; J.A.60; J.A.1229.  DuPont ignores, however, the

court's immediately preceding citations to DuPont's clear assertions of its

*subjective* beliefs about the "Licensed Field" term—all of which were directly

contradicted by DuPont's contemporaneous emails. J.A.60 (quoting DuPont's

representations that "the Licensed Field term was never *intended* to be—and

Pioneer and DuPont had *no reason to interpret it as*—a stacking restriction"; that

the parties "*all understood* that the Licensed Field term … has nothing to do with

stacking restrictions"; and that DuPont "did not at any time *understand* the

Licensed Field term to restrict Pioneer from stacking traits or genes"); J.A.3852;

J.A.3855. The court thus properly identified DuPont's misrepresentation as arising

from DuPont's assertion that it "*believe[d]* that Section 2.09 of the License

Agreement, the 'Licensed Field' definition, has no relation to stacking." J.A.48.

Similarly, the court's analysis of DuPont's claims concerning its right to sell

seeds with stacked OGAT/RR traits (J.A.49-52; J.A.1228; J.A.1937) turned on an

assessment of subjective beliefs. *See* J.A.52 (finding that emails contradicted

Defendants' "assertions that they *believed* they had the right to sell RR/OGAT

stacked seeds"). The court's analysis of DuPont's purportedly "objective"

argument on the scope of Section 3.01(a) also focused on DuPont's subjective

beliefs. Br. 30; J.A.64. The relevant misrepresentation was the implicit

representation that "Defendants *believe* that Section 3.01(a) does not contain any

type of field of use limitation" (J.A.48) when in fact "Defendants knew that …
section 3.01(a) is a field of use limitation" (J.A.64).

In its order, the court identified numerous other misrepresentations of
subjective belief—eight different occasions on which Defendants falsely claimed
to "subjectively believe[] they had this stacking right," (J.A.52-53), three different
times when DuPont falsely claimed that the parties "all understood that the
Licensed Field term … has nothing to do with stacking restrictions" (J.A.60), and
three different places where DuPont falsely claimed that it was not "fully aware"
that the Licensed Field term related to stacking until 2008 (J.A.63).  The district
court thus had "ample evidence to support" its sanctions given the falsehoods and
bad faith exhibited DuPont, and its order should "not be disturbed."[14]  *Boogaerts v.
Bank of Bradley*, 961 F.2d 765, 768 (8th Cir. 1992).

### B.    DuPont's Ability To Use Selectable Markers Is Not At Issue

DuPont attempts—for the first time on appeal—to conflate the use of a
"selectable marker" with efforts to "commercialize a stack of glyphosate-tolerant

---

[14]    DuPont argues that the district court's use of its inherent power in this case
"conflict[s] with" Rule 11 by sanctioning legal arguments, thus "creat[ing] the
serious risk of 'chill[ing]'" attorney advocacy.  Br. 34-36.  For the same reasons
articulated above, that accusation is unfounded.  Nothing in Rule 11 protects
DuPont's conduct here.  Indeed, the Rule permits courts to sanction an attorney
who signs papers making *unsupported* factual statements, much less *known factual
misrepresentations*.  Fed. R. Civ. P. 11(b)(3).  Moreover, Eight Circuit law holds
that a district court does not abuse its discretion in assessing fees under its inherent
authority, rather than under Rule 11.  *See Greiner v. City of Champlin*, 152 F.3d
787, 789 (8th Cir. 1998) (citing *Chambers*, 501 U.S. at 43).

traits." Br. 11 n.2, 49-51.  That argument is not only waived, but scientifically wrong, inconsistent with DuPont's internal documents, and simply not what DuPont did here with its OGAT genes.

DuPont waived any argument equating selectable markers and commercial-gene stacks.  DuPont never argued in the district court that using OGAT as a selectable marker was equivalent to using OGAT in a commercial OGAT/RR product.  Nor did it present any evidence to support its newly minted assertion that a "marker gene will be present in … any resulting commercial products, and cannot be bred out without losing the desirable trait." Br. 11 n.2.  This Court should therefore decline to consider DuPont's selectable-marker argument. *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1363 (Fed. Cir. 1999) ("[A] party's argument should not be a moving target." ).

In any event, DuPont's argument fails for at least three reasons.  *First*, DuPont's description of selectable markers is scientifically incomplete and incorrect.  A selectable marker is a gene inserted into a transformed cell along with a separate "gene of interest" as a research tool to help researchers make an initial determination whether the transformation has succeeded.  *Supra* p. 9-10.  The marker gene need not be present or expressed in the final commercial product.  For example, a selectable marker may express a trait sufficiently well, in a laboratory setting, to allow identification of cell samples, but the resulting plant may not

**CONFIDENTIAL MATERIAL OMITTED FROM THIS PAGE**

express that marker gene in "tissues of the mature plant"[15] or at "commercially

acceptable levels."[16] And contrary to DuPont's suggestion—which cites only

inapposite background from DuPont's counterclaim—a marker gene *can* be "bred

out" or otherwise removed from a plant's genome while still retaining the gene of

interest.[17]

*Second*, DuPont's internal communications drive home the distinction

between selectable markers and commercial-gene stacking. ▄▄▄ described the

stacking restrictions in the draft agreement to be a "walk-away" issue only "to the

---

[15] USDA, *Availability of Environmental Assessment for Field Test of Genetically Engineered Rice Expressing Lysozyme*, 70 Fed. Reg. 8762, 8762 (Feb. 23, 2005) ("This gene is a selectable marker that is only expressed during plant cell culture and is not expressed in any tissues of the mature plant.").

[16] *See, e.g.*, FDA, *Biotechnology Consultation Note to the File BNF No. 000034* (Sept. 18, 1996), http://www.fda.gov/ForConsumers/ConsumerUpdates/ ucm161154.htm ("Tolerance to the herbicidal compound glyphosate was utilized as a selectable marker during the development of MON809 corn," but "MON809 corn will not tolerate application of commercially acceptable levels of glyphosate and thus, will be marketed only for its insect resistant qualities.").

[17] *See, e.g.*, Padgette, 35 Crop Sci. at 1457 (GUS marker bred out from most successful line of transformed soybeans); USDA, *Plant Pest Risk Assessment for Monsanto MON 87701 Soybeans* 3 n.2 (June 28, 2011), *available at* http://www. aphis.usda.gov/brs/aphisdocs/09_08201p_dpra.pdf (glyphosate tolerance marker "was bred out, and is not present in MON 87701'); Lambert et al., *Cre-lox-Based System for Multiple Gene Deletions and Selectable-Marker Removal in* Lactobacillus plantarum, 73 Applied & Envtl. Microbiology 1126, 1126-1127 (2007) (enzyme can remove marker where separate plasmids are used to insert marker gene and gene of interest); EPA, *Plant-Pesticides Subject to the Federal Insecticide, Fungicide, and Rodenticide Act and the Federal Food, Drug, and Cosmetic Act*, 61 Fed. Reg. 37,891, 37,892 (July 22, 1996) ("Selectable markers may even be lost from the plant during subsequent breeding with no effect on the plant-pesticidal active ingredient.").

extent that it prohibits us from using *selectable markers* for our entire trait pipeline," and he expressly acknowledged that DuPont "probably could agree *not to stack competitive traits* on Monsanto's." J.A.14299. DuPont's post-agreement documents likewise showed that DuPont did not believe it had "commercial rights." J.A.14291. Nor did DuPont's in-house counsel even mention the argument when straining to find a basis for commercializing a glyphosate-on-glyphosate stack in the wake of OGAT's failure as a stand-alone product.

*Third*, DuPont fails to acknowledge that it did not and could not use the *glyphosate*-tolerance component of Optimum® GAT® as a selectable marker to develop new traits on Roundup Ready® seed. "GAT" itself confers Glyphosate and ALS Tolerance due to two separate genes, a glyphosate-tolerance gene ("gat4601") and an ALS-tolerance gene ("gm-hra"). OGAT's glyphosate tolerance would have been useless as a selectable marker on Roundup Ready® seed because if DuPont had sprayed the cells with glyphosate, it would have been unable to determine whether the surviving cells' glyphosate tolerance derived from Roundup Ready® or from OGAT. Indeed, when DuPont created OGAT soybeans, it selected for successfully transformed soybeans based on their ALS resistance, not their glyphosate resistance.[18]

---

[18] USDA, *Petition for the Determination of Nonregulated Status for Herbicide Tolerant 356043 Soybean*, at 16, http://www.aphis.usda.gov/brs/aphisdocs/06_27101p.pdf.

In short, regardless of whatever subjective beliefs DuPont may have had about using another glyphosate-tolerance gene as a *selectable marker*, that cannot justify DuPont's representations to the court that it believed the Agreement authorized it to create and sell a *commercial-gene stack*, *i.e.*, a soybean "product" expressing both the OGAT and Roundup Ready® traits at a commercial level consistently across generations. *See* J.A.15114-15115(46:18-47:10). Because DuPont's selectable marker theory was not argued below and is unsupported on appeal, this Court should reject the argument.

### C. The Statements Of DuPont's High-Level Employees Are Appropriately Attributable To DuPont

DuPont faults the district court for concluding that DuPont acted in bad faith based on statements of individual employees, which, it contends, cannot be attributed to the corporation as a whole. *See* Br. 23, 30, 31, 34, 38, 40, 56. That argument is doubly wrong.

*First*, the district court did not impose sanctions for the intra-corporate statements made in 2002 or 2007-2008 by DuPont's employees. Rather, it imposed sanctions for statements made to the court by DuPont's litigation counsel. There is no question that statements of a corporation's counsel during ongoing litigation are attributable to the corporation; indeed a corporation is required to speak and act through counsel in federal court proceedings. *See Rowland v. California Men's Colony*, 506 U.S. 194, 201-202 (1993). The "collective scienter"

law cited by DuPont is thus inapplicable. Those cases hold that, although a corporation may be held constructively responsible for the collective knowledge of all its agents, when an element of deceptive intent is required (*e.g.*, to establish fraud), the required state of mind must exist in the individual making the false statement.[19] But the relevant conduct here is DuPont's statements through counsel *during the present litigation. See* J.A.15105(37:15-17). And it was the latter conduct that the district court examined and found to be sanctionable. *See* J.A.65, 68-69, 75.

*Second*, the internal communications of DuPont's top negotiators and lawyers were relevant in determining if DuPont made misrepresentations to the court. DuPont claimed it was entitled to reformation—a claim it could only succeed on by establishing what it *believed*, at the pertinent times, was the parties' actual agreement. As a practical matter, that belief could be established only through the statements of DuPont's executives and in-house lawyers who negotiated the Agreement, in particular, ███████████████. *See* J.A.15271 (███████████████████████). ██████████████ are the two corporate representatives designated to receive notices under the license, J.A.677, and ██████ signed both 2002 agreements for Pioneer, J.A.682; J.A.722; *see also* J.A.15271(853:15-17) (describing ████ as ████████████████████

---

[19] *See, e.g., Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365-367 (5th Cir. 2004).

**CONFIDENTIAL MATERIAL OMITTED FROM THIS PAGE**

███████████████████████████████████████████████████). DuPont

itself relies on many statements made by the same negotiators to support its own

characterization of DuPont's subjective understanding. *See, e.g.*, Br. 50-51

(discussing the significance of ███████████████████ emails in

establishing "DuPont's beliefs").

Moreover, the court made numerous findings explaining how the in-house

negotiators' statements could be fairly characterized as the corporation's views.

These employees were "high-level executives and in-house counsel" who

"negotiated the license agreements—the individuals who would have the best

personal knowledge of Pioneer's intent during negotiations and at the execution of

the license agreements." J.A.66; J.A.68; *see also* J.A.50 n.4; J.A.55-56; J.A.61;

J.A.73-74. The court properly treated the negotiators' statements as representative

of DuPont's understanding of the Agreement's relevant terms. *Accord Cerberus*,

794 A.2d at 1144-1147 (looking to the documents and testimony of various

corporate agents, including outside counsel, to determine the corporations'

intended agreement).

### D. The Court Properly Relied Upon DuPont's 2007-2008 Statements

DuPont argues that the court erred in relying on post-agreement emails in

ordering sanctions because those statements were "categorically immaterial." Br.

57. However, these emails both reflected DuPont's beliefs at the time it negotiated

the Agreement in 2002 and were relevant to DuPont's broad claims about what it *continued to believe* even after execution, which itself was critical to avoiding a possible defense of laches. The court therefore properly examined evidence of DuPont's beliefs up to the time of this litigation.

*First*, the 2007-2008 documents, many of which were authored by the same individuals who had negotiated the 2002 Agreement, shed additional light on DuPont's beliefs at the time it negotiated the Agreement. Indeed, courts routinely rely on post-agreement conduct and statements to help determine whether the parties reached a "definite and specific" prior agreement, as required for reformation. *See Fitzgerald v. Cantor*, No. 16297-NC, 1999 WL 64480, at \*2 (Del. Ch. Jan. 28, 1999); *see also Clariant Corp. v. Harford Mut. Ins. Co.*, 11 A.3d 220, 221 (Del. 2011) (relying on post-agreement conduct as evidence of parties' prior understanding); *Cerberus*, 794 A.2d at 1155 (defendants' conduct "after the transaction closed" was relevant to whether defendant was mistaken about agreement that plaintiff sought to reform); *Croxton v. Chen*, No. 147, 1998, 1998 WL 515346, at \*1-3 (Del. June 26, 1998) (post-agreement statements used as evidence of prior understanding).

Had DuPont actually believed in 2002 that the Agreement allowed it to create and commercialize seed that combined another glyphosate-tolerance trait with Monsanto's Roundup Ready® trait, there is no way that just a few years later

**CONFIDENTIAL MATERIAL OMITTED FROM THIS PAGE**

the same in-house counsel who negotiated the Agreement would have been telling others within DuPont "we don't have commercial rights" (J.A.14291), the right to "sell a stacked product of 40-3-2 and GAT" is "[q]uestionable" (J.A.14275), and there are "no commercial rights" to an OGAT/RR stack "[b]ecause of the field of use limitation in 3.01(a)" (J.A.14799). The district court also found that

███████████ July 10, 2007 email analyzing Monsanto's "likely" arguments "*express[ed] no surprise* at an *expected* claim by Monsanto," suggesting DuPont knew it never had full glyphosate-on-glyphosate stacking rights. J.A.72; J.A.74. Far from being "categorically immaterial," these internal documents provided damning evidence that DuPont had not been honest with the court.

*Second*, the 2007-2008 documents were also relevant to DuPont's representations that it remained mistaken *until 2008*. *See, e.g.,* J.A.60; J.A.63; J.A.69; J.A.75 (quoting numerous statements by DuPont's lawyers that DuPont's subjective beliefs about the parties' agreement continued at least until 2008, when Monsanto supposedly announced its position). Indeed, had DuPont *not* alleged that it *remained mistaken* about its stacking rights until shortly before this litigation commenced, it could have been barred by laches from asserting claims of mutual and unilateral mistake. *See, e.g.*, *Nationwide Mut. Ins. Co. v. Starr*, 575 A.2d 1083, 1088-1089 (Del. 1990); *Collins v. Burke*, 418 A.2d 999, 1003-1004 (Del. 1980). There was therefore a direct connection between DuPont's

misrepresentations regarding its post-agreement understanding and the harm

inflicted on Monsanto and the court from having to address DuPont's meritless

reformation claims.

### E. The Court's Dismissal Of The Reformation Claim Was Proper

DuPont's argument that the court "impermissibly resolve[d] genuine merits

issues between the parties" (Br. 47) also fails. DuPont has stipulated to the

dismissal of all its claims on the merits (J.A.33976), thereby establishing that there

are no merits issues left to resolve. DuPont cannot use its appeal from the court's

award of attorney's fees to try to take back that concession.

In any event, DuPont's argument misses the point. The court did not

"resolve" DuPont's claims on the merits but rather exercised its inherent equitable

authority to sanction DuPont for its litigation misconduct. Even if there had been

any merit to DuPont's claims, and even if the dismissal of those claims were before

this Court, DuPont has not shown that the district court abused its discretion when

it held that dismissing the claims was "the only means to deter [DuPont's]

misconduct and preclude" DuPont from further "abuse of the judicial process."

J.A.76. Indeed, it is well established that even a meritorious claim may be

dismissed as an appropriate sanction for a party's bad faith. *See United States v.

Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993) ("[T]he inherent power to

dismiss a case for the misconduct of counsel is undoubtedly clear.").

Moreover, DuPont's claims were anything but meritorious. Even if DuPont had been permitted to pursue its reformation claim further notwithstanding its misrepresentations, DuPont could not have shown that it was entitled to reformation "by clear and convincing evidence" as required by Delaware law. *Cerberus*, 794 A.2d at 1149. There is simply nothing in the record to suggest it was "highly probable, reasonably certain, and free from serious doubt," that DuPont was honestly a victim of mutual or unilateral mistake—particularly given that DuPont's documents directly refute the core assertions underlying its purported "mistake." *Id.* at 1151. Given DuPont's numerous misrepresentations of its subjective beliefs and the paucity of any real evidence in DuPont's favor, the court correctly sanctioned DuPont by dismissing its meritless reformation claims.

## F. The More Stringent Standard For "Fraud On The Court" That DuPont Urges Governs Only Extremely Severe Sanctions Not At Issue Here

Relying on the district court's references to "fraud on the court," DuPont argues that the court was required to meet a stringent standard that, DuPont claims, was not satisfied here (*e.g.*, Br. 27-29). That argument misfires for several reasons. First, the only sanction DuPont can contest on appeal is the award of attorney's fees to Monsanto, which required the court to find only that DuPont engaged in bad-faith abuse of the judicial process—precisely what the court concluded in well supported findings. DuPont's proffered standard applies only in entirely different

situations when the court imposes a much more drastic remedy, usually under Rule 60. Second, the court used the term "fraud on the court" in a broad not a technical sense to refer to DuPont's bad-faith conduct in making known fraudulent representations to the court. Third, the court's order is well supported under the correct bad-faith standard.

*First*, while "[a]ny fraud connected with the presentation of a case to a court is fraud upon the court, in a broad sense," *see* 11 Wright, et al., *Federal Practice and Procedure* § 2870 (3d ed. 2012), DuPont relies upon a much narrower (and inapplicable) definition of "fraud on the court" derived from what is now Rule 60(d)(3). Rule 60(d)(3) allows a court to impose the extreme sanction of setting aside a final judgment in a party's favor even after the expiration of Rule 60(c)(1)'s one-year time limit for modifying final judgments, where the party is found to have engaged in "fraud on the court." For such a remedy to be warranted, there must be "the most egregious misconduct," even more egregious than the general fraud standard of Rule 60(b)(3), which allows a final judgment to be set aside within one year because of fraud.[20] This strict definition serves the

---

[20] *See Greiner*, 152 F.3d at 789; *see also Broyhill Furniture Indus., Inc. v. Craftmaster Furniture Corp.*, 12 F.3d 1080, 1085 (Fed. Cir. 1993); *Great Coastal Exp., Inc. v. International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 675 F.2d 1349, 1356-1357 (4th Cir. 1982); 11 *Federal Practice and Procedure* § 2870.

paramount interest in the finality of judgments and ensures that the exception of Rule 60(d)(3) does not swallow the general one-year limit.[21]

Virtually all of the cases DuPont cites in support of its "fraud on the court" standard (*see* Br. 27, 31-33, 53-55) apply Rule 60 or its reasoning in assessing whether to disrupt a final judgment past a prescribed time limit.[22] Here, by contrast, the imposition of attorney's fees represented a considerably "less severe" form of sanction that was sufficiently supported by a finding of bad faith. *See Chambers*, 501 U.S. at 45-46.

*Second*, although the district court used the term "fraud on the court" to refer to DuPont's litigation misconduct, there is no indication that the court meant to refer to anything different than "bad-faith abuse of the judicial process." Nothing

---

[21] *See, e.g.*, *United States v. Buck*, 281 F.3d 1336, 1342 (10th Cir. 2002); *Broyhill*, 12 F.3d at 1085; *Great Coastal*, 675 F.2d at 1355; *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978); *Kupferman v. Consol. Research & Mfg. Corp.*, 459 F.2d 1072, 1074 (2d Cir. 1972).

[22] For the cases that did not explicitly address Rule 60, the conduct in *Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 195-196 (8th Cir. 1976), fell short under any standard of the conduct required for the "extreme" sanction of patent unenforceability; the plaintiff's "deliberate effort" to mislead defendants about the true nature of his claim in *Nichols v. Klein Tools, Inc.*, 949 F.2d 1047, 1048-1049 (8th Cir. 1991), satisfied any standard and justified dismissing the entire lawsuit; and the discussion of "fraud on the court" in *United States v. Smiley*, 553 F.2d 1137, 1144-1145 (8th Cir. 2009), concerns the inapposite procedural posture of vacating a criminal sentence. The cases thus have little to say about the proper dividing line between sanctionable and non-sanctionable conduct. In any event, to the extent these cases are applicable at all, DuPont's conduct here mirrors Nichols's: knowing misrepresentation of the facts underlying a claim.

in the Sanctions Order suggests that the court was referring to "fraud on the court" in the narrower sense advocated by DuPont. The order cited none of the cases on which DuPont relies for its "fraud on the court" standard (*see* J.A.46-47; J.A.76-78), and, in fact, it assessed DuPont's misconduct only as a basis for finding "bad faith" in order to assess attorney's fees (*see* J.A.47; J.A.77; *see also* J.A.52; J.A.59; J.A.63-64 (repeatedly finding that DuPont "abuse[d]" "the judicial process")). The court thus applied the correct standard.

*Third*, the court made fully supported findings under that standard and imposed an appropriate remedy in light of the violations found. *See supra* pp. 44-46. DuPont "knowingly" and "repeatedly" made false representations to the court regarding factual "issues critical to their breach of contract defenses and counterclaims," "compromised the integrity of the case and abused the judicial process," and "delayed this litigation" and "caused substantial expense"—actions that "amount[ed] to vexatious conduct" and "bad faith." J.A.76-78. No part of that decision constituted an abuse of the court's discretion and the Sanctions Order should therefore be affirmed.

## CONCLUSION

The judgment of the district court should be affirmed.


Dated:  September 23, 2013                    Respectfully submitted,


                                              /s/ Seth P. Waxman

GEORGE C. LOMBARDI                            SETH P. WAXMAN
JAMES MATTHEW HILMERT                         PAUL R.Q. WOLFSON
ERIC J. MERSMANN                              THOMAS G. SAUNDERS
WINSTON & STRAWN LLP                          CAROLYN JACOBS CHACHKIN
35 W. Wacker Drive                            DANIEL AGUILAR
Chicago, IL  60601                            WILMER CUTLER PICKERING
(312) 558-5600                                   HALE AND DORR LLP
                                              1875 Pennsylvania Avenue, N.W.
JOHN JUSTIN ROSENTHAL                         Washington, D.C.  20006
WINSTON & STRAWN LLP                          (202) 663-6000
1700 K Street, N.W.
Washington, D.C.  20006
(202) 282-5000


JOSEPH P. CONRAN
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO  63105
(314) 480-1500

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of September, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, and served a copy on the following counsel by the CM/ECF system and electronic mail:

> THOMAS G. HUNGAR
> SCOTT P. MARTIN
> GIBSON, DUNN & CRUTCHER LLP
> 1050 Connecticut Avenue, N.W.
> Washington, D.C. 20036
> (202) 955-8500
>
> JAMES P. DENVIR III
> AMY J. MAUSER
> BOIES, SCHILLER & FLEXNER LLP
> 5301 Wisconsin Avenue, N.W.
> Washington, D.C. 20015
> (202) 237-2727

/s/ Seth P. Waxman
Seth P. Waxman

## CERTIFICATE OF COMPLIANCE

Counsel for Plaintiffs-Appellees hereby certifies that:

1.     The brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because exclusive of the exempted portions it contains **13,957** words as counted by the word processing program used to prepare the brief; and

2.     The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2003 in a proportionally spaced typeface: Times New Roman, font size 14.

Dated:  September 23, 2013                    /s/ Seth P. Waxman
                                             Seth P. Waxman